RECEIVED

JUN 04 2024

KELLY L. STEPHENS, Clerk

Case No.23-1891

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**ED. FOSTER**

Petitioner-Appellant,

vs.

**CHRIS KING**

Respondent-Appellee.

**On Appeal from the United States District Court**
**For the Eastern District of Michigan, Southern Division**
District Court Case No. 15-cv-12265
Laurie J. Michelson District Judge
**APPELLANTS BRIEF**
**PROOF OF SERVICE BY FIRST CLASS MAIL**

**NOTARIZED STATEMENT OF DEPOSITING**
**MOTION PURSUANT TO FRAP 25 (a)(2)(c)**

| | |
|---|---|
| | # 266862 |

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

ED D. FOSTER
Petitioner-Appellant *in Pro Per*
ERNEST C. BROOKS CORRECTIONAL FACILITY
2500 S. SHERIDAN DR.
MUSKEGON, MI 49444

**ED D. FOSTER**

| | | |
|---|---|---|
| | Petitioner-Appellant, | Case No.23-1891 |

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | | |
|---|---|---|---|
| **ED D. FOSTER** | | | |
| | Petitioner-Appellant, | | Case No.23-1891 |
| vs. | | | Hon: Laurie J. Michelson |
| **CHRIS KING**, Warden | | | |
| | Respondent-Appellee. | | |

_______________________________________/

**PROOF OF SERVICE BY FIRST CLASS MAIL**

The undersign affirms that on May 31 ,2024 he mailed a copy of his amended **APPELLANTS BRIEF**
Proof of Service by First Class Mail, Notarized Statement of Depositing Motion Pursuant to FRAP 25(a)(2)(C) and attachments and/or exhibits by first class mail to:

Michigan Department of Attorney General
Attorney for Respondent-Appellee
Habeas Corpus Division
P.O. Box 30212
Lansing, Michigan 48909

#266862
ED D. FOSTER
Petitioner-Appellant *in Pro Per*
ERNEST C. BROOKS CORRECTIONAL FACILITY
2500 S. SHERIDAN DR.
MUSKEGON, MI 49444

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | | |
|---|---|---|---|
| **ED D. FOSTER** | | | |
| | Petitioner-Appellant, | | Case No.23-1891 |
| vs. | | | Hon: Laurie J. Michelson |
| **CHRIS KING**, Warden | | | |
| | Respondent-Appellee. | | |

______________________________/

**NOTARIZED STATEMENT OF DEPOSITING MOTION**
**PURSUANT TO FRAP 25(a)(2)(C)**

ED D. FOSTER, first duly sworn, states that he is an inmate confined at the Ernest C. Brooks, 2500 S. Sheridan Dr., in Muskegon MI 49444, and on this date May 31 2024, he turned over to the Michigan Department of Corrections officials to deposit, an original and three copies of his **Appellants Brief**; Proof of Service By First Class Mail; Notarized Statement Of Depositing Motion Pursuant To FRAP 25(a)(2)(C); and attachments and/or exhibits in the Ernest C. Brooks Correctional Fac. internal mail system with first-class postage fully prepaid.

| | |
|---|---|
| | # 266862 |
| **ED D. Foster**<br>Petitioner-Appellant *in Pro Per* | |

| | |
|---|---|
| Subscribed and sworn to before me on: | |
| | County, Michigan |
| My commission expires: | |
| Signature: | |

Notary public

RECEIVED

JUN 04 2024

KELLY L. STEPHENS, Clerk

| | | | |
|---|---|---|---|
| vs. | | | Hon: Laurie J. Michelson |
| **CHRIS KING,** Warden | | | |
| | Respondent-Appellee. | | |

______________________________/

**APPELLANTS BRIEF**

NOW COMES Edward Foster, Petitioner-Appellant, pursuant to Fed. R. App. P. 24(a)(5), states in support of this motion the following:

1. On August 28,2023, the Honorable Laurie J. Michelson, of the United States District Court for the Eastern District of Michigan, southern Division, issued an Order Denying Appellant's petition for writ of habeas corpus under 28 U.S.C. § 2254; 2023 U.S. Dist. Lexis 151306, but the court also granted a Certificate of Appealability (COA) on one issue the failure to correct known false and perjured testimony by prosecution key witness, Keith Nickerson and also granting leave to appeal In Forma Pauperis.

2. On September 5, and 14,2023 Petitioner filed a timely notice of appeal from that decision as well as a Motion for Appointment of Counsel.

3. Now petitioner on this fore mentioned date, files a Memorandum of Law in support of Petition for Writ of Habeas Corpus.

WHEREFORE, Petitioner-Appellant request that this Honorable Court grant the following relief:

A. Grant this motion to allow Petitioners - Appellants Brief to

allow him to proceed with his appeal or whatever relief this Court deems appropriate including Oral Arguments and Appointment of Counsel.

Respectfully submitted,


| | |
|---|---|
| | # 266862 |

**ED D. FOSTER**
Petitioner-Appellant *in Pro Per*
ERNEST C. BROOKS CORRECTIONAL FACILITY
2500 S. SHERIDAN DR.
MUSKEGON, MI 49444


Date: May / 31 ,2024

## TABLE OF CONTENTS


| | Page: |
|---|---|
| Index of Authorities | ii,iii |
| Statement of Jurisdiction | iv |
| Statement of Question Presented | v |
| Trial Facts | 1 |
| Standard of Review | 15 |


## ISSUES PRESENTED

**I.** WAS PETITIONER'S FEDERAL DUE PROCESS RIGHT TO A FAIR TRIAL VIOLATED BY THE INTRODUCTION OF FALSE AND PERJURED TESTIMONY FROM KEITH NICKERSON, A KEY PROSECUTION WITNESS?

**II.** WAS PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL VIOLATED WHERE TRIAL COUNSEL FAILD TO INVESTIGATE AND CALL A KNOWN WITNESS, WHO WOULD HAVE PROVIDED KEY EVIDENCE IN SUPPORT OF THE DEFENSE'S CHOSEN THEORY?

**ACTUAL INNOCENCE CLAIM**

**III.** CAN THIS HONORABLE COURT AND SHOULD THIS HONORABLE COURT ADDRESS THE MERITS OF THE UNDERLYING ISSUES BECAUSE: (A) TRIAL COUNSEL IS INEFFECTIVE, (B) APPELLATE COUNSEL IS INEFFECTIVE, (C) PETITIONER IS ACTUALLY INNOCENT?

## INDEX OF AUTHORITIES

### Cases

*Alcorta* v *Texas, 355 US 28(1957)* .... 4

*Anderson* v *City of Bessemer* 470 US 564 573(1985), .... 4

*Arizona v Fulminante*, 499 U.S. 279, 296, 11 S. ct. 1246; 113 L, Ed 2d 302 (1991). .... 8

Benge v Johnson, 474 F.3d 236, 241(6th Cir. 2007). .... 4

*Blackston v Rapelje*, 780 f3d 340, 355 (6th Cir. 2015), .... 13

*Bram v United States*, 168 U.S. 532 (1897) .... 12

*Brooks v Tennessee*, 626 F3d 878, 895 (6th Cir 2010). .... 8

*Bruton v United States*, 391 US 123, 140 (1968), .... 12

*Chambers* v *Mississippi*,410US 284(1973) .... 5

*Chapman v California*, 386 U.S. 18, 22-23 (1986). .... 9

*Chapman v California*, 386 U.S. 18, 22-23; 17 L.Ed . 2d 705; 87 S. Ct. 824 (1967). .... 18

Coe v Bell, 161 F3d 320, 343 (6th Cir.1998). .... 16

*Cooper v Haas*, 2018 U.S. App LEXIS 28987 .... 11

*Dowling v United States,* 493 U.S. 342, 352; 110 S. Ct. 668; 107C Ed 2d 708 (1990). .... 20

*Fahy v Connecticut*, 375 U.S. 85, 86-87 (1963). .... 9

*Foster v King*, 2023 U.S. Dist. LEXIS 151306 .... 9

*Freeman v Trombley*, 744 F. Supp. 2d 607 (2010), .... 14

Greer v Miller, 483 U.S. 756,766 n.8., 107 Sct. 3102; 97 L.Ed 2d 618(1987) .... 17

*Hodgson v Warren*, 622 F3d 591 600-601 (6th Cir.2010) .... 18

*Holland v United States*, 348 U.S. 1 21 (1954) .... 18

*Ivory* v *Jackson* 509 F. 3d 284, 291(6th Cir 2007) .... 3

*Jackson v Virginia*, 443 U.S. 307 (1979) .... 16

*Jones v Kentucky* 97 F2d 335, 338 (6th Cir. 1938) .... 18

*Jones v United States*, 527 U.S. 373 (1999). .... 11

*Kyles* v Whitby, 514 US 419,437 (1995). .... 4

*Maxwell v Roe*, 628 F3d 486 (9th Cir. 2010). .... 9

*Miranda v Arizona*, 384 U.S. 436 (1966). .... 12

*Mooney v Holohan*, 294 U.S. 103, 112 (1935). .... 7

*Mooney* v *Holohan*, 294 US 103 112(1935). ..... 4
*Murray v Earie*, 405 F3d 278 (5th Cir 2005) ..... 13
*Napue* v *Illinois* 360 US 264,269 (1959). ..... 4
Napue v Illinois, 300 U.S. 264 (1909); ..... 16
*Napue v Illinois,* 360 U.S. 264, 269 (1959). ..... 20
*Northern Marana Islands v Bowie*, 243 f3d 1109, 1118 (9th Cir. 2001). ..... 7
*Olano*, 507 U.S. 725, 736-737, (1993) ..... 20
*People v Lafler*, F3d 503 at 51 7 ..... 19
*People v Savvides,* I N.Y. 2d 554, 557, 154, N.Y. S. 2d 885 (1956) ..... 7
*Rice v White*, 660 f3d 242-250, (6th Cir 2011). ..... 10
*Richard v Marsh*,481 U.S. 200 (1987), ..... 11
*Rose v Clark*, 478 U.S.570, 577-78, 92 LEd 2d 460, 106 S. Ct 3101 (1956). ..... 14
*Shih Wei su v Filion*, 335 F3d 119, 126-127 (2nd Cir. 2003) ..... 9
*Smith v Metrish,* 436 Fed Appx. 544 at 586 ..... 6
*Taylor v Illinois*,484 U.S.400,416 (1988) ..... 19
*Taylor* v *Withrow* 288 F. 3d 846 850 (6th Cir. 2002) ..... 4
United States v Agurs, 427 U.S. 97 (1976); ..... 16
*United States* v *Agurs,*427 US 97,103-04(1976), ..... 4
*United States* v *Gvosum Co.* 333 US 364,395 (1948) ..... 4
*United States v Howell*, 285 F3d 1283 (10th Cir. 2002 citing the same) ..... 18
United States v Hynes, 467 F3d 951,957 (6th Cir. 2006). ..... 17
*United States v LaPage*, 231 F3d 1488 ,492 (9th Cir. 2000) ..... 19
*United States v Lochmondy*, 890 F2d 817, 822 (6th Cir 1989) ..... 7
*United States v Lovasco*, 431, U.S. 783, 790; 97 S. Ct. 2044 52 L. Ed2d 752 (1977). ..... 20
*United States v Smith*, 980 F. Supp. 2d at 868 (6th Cir. 2013). ..... 18
*United States v. Jean Baptise,* 166 F3d 102 (2nd Cir.1999) ..... 18
*Watkins v Sowders*, 449 U.S. 341, 352 (1981) ..... 12
*Williams v Beyley*, 380 F3d 932, 941 (6th Cir. 2004). ..... 10

## STATEMENT OF JURISDICTION

This Honorable Court has jurisdiction to adjudicate this matter on the merits pursuant to the all Writs Act of 28 USC§ 1651, and 28USC§ 2253 and 2254, et seq...

## STATEMENT OF QUESTIONS PRESENTED

## ISSUES PRESENTED

I. WAS PETITIONER'S FEDERAL DUE PROCESS RIGHT TO A FAIR TRIAL VIOLATED BY THE INTRODUCTION OF FALSE AND PERJURED TESTIMONY FROM KEITH NICKERSON, A KEY PROSECUTION WITNESS?

Petitioner answers "YES"
The State Courts did not resolve this issue

II. WAS PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL VIOLATED WHERE TRIAL COUNSEL FAILD TO INVESTIGATE AND CALL A KNOWN WITNESS, WHO WOULD HAVE PROVIDED KEY EVIDENCE IN SUPPORT OF THE DEFENSE'S CHOSEN THEORY?

Petitioner answers "YES"
The State Courts did not resolve this issue

### ACTUAL INNOCENCE CLAIM

III. CAN THIS HONORABLE COURT AND SHOULD THIS HONORABLE COURT ADDRESS THE MERITS OF THE UNDERLYING ISSUES BECAUSE: (A) TRIAL COUNSEL IS INEFFECTIVE, (B) APPELLATE COUNSEL IS INEFFECTIVE, (C) PETITIONER IS ACTUALLY INNOCENT?

Petitioner answers "YES"

## STATEMENT OF FACTS

I hereby include Petitioner's "Statement of Facts" as they have been previously presented before the E.D. of Michigan Federal Court as accurate and truthful to the best of Petitioners knowledge. This Honorable Court may make reference to these statements of facts as true and this Honorable Court sees fit. In the aforementioned Petition before this Court.

## PERTINENT FACTS

In its 2013 opinion, the Michigan Appeals articulated its factual findings from the trial Court record as follows: The prosecutor called Keith Nickerson, a "jailhouse snitch", as one of its witnesses *People* v *Foster* unpublished opinion of the Court of Appeals issued August 8,2013 (Docket No.301361), pg.10. Nickerson testified that in April 2010, he was sentence on a Federal I bank robbery charge to ten years eight months and that he was currently serving that sentence. Id. Nickerson testified that the prosecutor in the instant case did not indicate that he would do anything for him in regard to the cases he had pending and that the prosecutor has not done anything on his behalf When asked by the prosecutor, "have I offered to do anything on your behalf in regard to your testifying?" Nickerson. responded, "No". Id.

On cross-examination however, defense counsel elicited from Nickerson the fact that he also testified at Petitioner's preliminary examination and at the same time, he had not yet been sentenced in his federal bank robbery case. Id. Defense counsel then asked Nickerson a series of questions, which exposed the fact a 5k motion had been filed his behalf. Id. 10-13. In which Nickerson vehemently denied receiving the benefits associated with the 5K motion for his testimony against Petitioner, which was a 5-year sentence Reduction.

Therefore, the Michigan Court of Appeals held that because "[d]efense counsel's cross-examination called Nickerson's "credibility" even more into question," it cannot be concluded the Petitioner's conviction was "obtained through perjured testimony." Id.13.

However, the Court observed that there was "significant other evidence" concerning [Petitioner's] participation in at least the "beating" of Boothby "-not in her murder, which carries life in prison without the possibility of parole. Id. 1,13.

Although the Federal District Court primarily relied on facts primarily recited by the Michigan Court of Appeals, in this case the Eastern District Court, relied on a few additional details from the trial

Court record. See United States District Court for the Eastern District of Michigan Southern Division, case No. 15-12265, decided August 28,2023, pg.1.

Several discrepancies in testimony where found and pointed out by the District Court. Several people for example, witnessed the fight in the Blue Star Lounge parking lot involving decedent. Boothby, and others. Id. 1-2. Those individuals purportedly include Ivory Shaver, Gill, Scottie Shaver (Ivory's nephew), and at least according to some accounts-petitioner, Ed Foster. Id. 2. Where some testimony alleged Petitioner hit Boothby in the parking lot, other testimony alleged Petitioner was either never at the lounge, or he left by himself without getting involved in the fight.Id.3-4 Adrienne Burnette- who had been dating Scottie at the time gave what was perhaps the most controversial and flawed testimony during trial.

Where, she supposedly witnessed the fight outside and placed Petitioner in the parking lot and very much involved in the mayhem. Id.4-5. She also claimed to have seen Petitioner and others take Boothby to Gill's car and leave in the same vehicle. Id.5. Despite the testimony of Sharon Martinez, where she testified to seeing Foster getting into his SUV alone at the exact time she seen Gill's car drive over Boothby. See TT Vol.

From there, Burnette claims she was threatened by Scottie to follow Gill's car. as they drove to an isolated area where Petitioner and others purportedly took Boothby from Gill's car, placed her on the ground just outside the bar and beat her again while Gill choked her. Id.

Next came the idea to put Boothby back in Gill's car, dump her body on the street by the lounge, and drive over her to create the appearance of an accident. Id. 5-6.

Notably, Burnette was able to plead guilty to second degree murder, a lesser charge than she would have received had she not testified against Petitioner and others. Id. 6. Burnette testified in open court to being "fed" Petitioners name by law enforcement consequently and using his name as a "way out" of her circumstances. See TT Vol 10 pg.241-245.

Additionally, the District Court observed that Nickerson shared a cell with Petitioner while awaiting sentencing in the federal Court for a bank robbery conviction. ID. 6-7. Nickerson testified that Petitioner allegedly confessed to him that "he had kicked Boothby in the head" in the parking lot outside the Blue Star Lounge and was in one of the vehicles that drove over Boothby . Id. 6. With respect to any self-interest Nickerson may have had in testifying, the District Court relied upon the findings of the Michigan Court of Appeals, as stated above. Id. 6-7 to formulate it's denial.

However, the District Court also observed the fact that Nickerson was not the only jailhouse informant to testify. To be sure, Michael Smith was a jailhouse snitch and a self-proclaimed paralegal and "running the jail law library" at Marion County Jail in Indianapolis, where he was housed on the same block as Petitioner. Id. 8. Smith has convictions for forgery, theft, and fraud. Id. Smith testified that petitioner asked him for "representation, for advice, and to explain the nature and details of the case" to him. Id. Further, he continued to state that Petitioner supposedly confessed to his involvement in the beating and death of Boothby even "how he had run over her". Id.8-9. What's more, two Indiana state troopers also testified that petitioner asked whether someone could be charged with murder "if they were only there with the person who committed the murder" Id. 9. When one of the troopers informed him that a person could be charged as an accomplice, Petitioner allegedly asked if that would be true if a vehicle was involved. Id.

Importantly, besides finally admitting he may have received a reduced sentence for matters unrelated to his cooperation in Petitioners case. Nickerson also admitted to writing the federal judge with the details of Petitioners alleged confession. Id a 22. However, defense counsel was also able to elicit inconsistencies between Nickerson's letter and the testimony he provided in Court. Id. Further, the District Court observed that the Michigan Court of Appeals agreed with Petitioner in that it was "absolutely clear" that portions of Nickerson's testimony were false. But, because the state Court further noted that "other significant evidence" connected Petitioner to Boothby's assault, it is unlikely that Nickerson's false testimony as to his "credibility" would have changed the outcome." To this, the District Court concluded that, "at the very least, a reasonable jurist could have deliberated whether Nickerson 's false testimony would have changed the jury's verdict. Id 27. Thus, it denied habeas relief on this issue, as it found the false testimony to be harmless. Id.

Petitioner now seeks leave to appeal this decision. (see Appendices A-B).

## I. PETITIONER' S FEDERAL DUE PROCESS RIGHT TO A FAIR TRIAL UNDER THE FOURTEENTH AMENDMENT WAS VIOLATED BY THE INTRODUCTION AND FAILURE TO CORRECT KNOWN FALSE AND PERJURED TESTIMONY FROM A KEY PROSECUTION WITNESS, KEITH NICKERSON.

## Grounds for Relief

In habeas appeal , the District Court's legal conclusions are reviewed de novo, but its factual findings will not be set aside unless they are clearly erroneous . See *Ivory* v *Jackson* 509 F. 3d 284, 291(6th Cir 2007). A factual finding is clearly erroneous were, "although there is evidence to support it, the

reviewing Court on the entire evidence is left with the definite and firm conviction that a mistake has been committed: *Anderson* v *City of Bessemer* 470 US 564 573(1985), quoting *United States* v *Gvosum Co.* 333 US 364,395 (1948).

The standard for reviewing State-Court determinations on habeas, by contrast, is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), codified at 28 2254 (d) Ivory, 509 F. 3d at 291.

The AEDPA provides that:

> a federal Court may not grant a writ of habeas to a petitioner in state custody with respect to any claim adjudicated on the merits in state Court unless ( 1) the state Court's decision "was contrary to , or involved an unreasonable application of , clearly established Federal Law , as determined by the Supreme Court," or ( 2) the state Court's decision "was based on an unreasonable determination of the facts in light of evidence presented in the State Courts proceedings." *Taylor* v *Withrow* 288 F. 3d 846 850 (6th Cir. 2002) (Citation omitted) quoting 28 USC§ 2254(d).
>
> A state Court decision is considered contrary to...clearly established Federal law" if the two are "diametrically different, opposite in character or someone, or mutually opposed". *Williams* v *Taylor* 529 US 362, 405 (2000) (internal punctuations Omitted). Alternatively, to be deemed an "unreasonable application of ... clearly established Federal Law" a state-Court's decision On the merits must be "objectively unreasonable" not simply incorrect. Id. at 409 412. Further , the state Court's findings of fact are presume to be correct unless they ace rebutted by clear and convincing evidence. Benge v Johnson, 474 F.3d 236, 241(6th Cir. 2007).

## LEGAL PRINCIPLE

The Supreme Court has long recognized that Due Process is denied here "[the] state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through the deliberate deception of Court and jury by the presentation of testimony known to be perjured" *Mooney* v *Holohan,* 294 US 103 112(1935). Such conduct by the prosecution is Inconsistent with the rudimentary demand of justice. Id. The same holds true "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears". *Napue* v *Illinois* 360 US 264,269 (1959). As explained in *United States* v *Agurs,* 427 US 97,103-04(1976), a false testimony claim falls under the Brady disclosure doctrine. As such, the prosecution's knowledge standard is that of he knew, or should have known" *Agurs* 422 US at 103; see also *Kyles* v Whitby, 514 US 419,437 (1995). The contours of a false testimony claim were predominately shaped by two cases : *Napue* v *Illinois,* 360 US at 153-54; and *Giglio* v. *United States*, 405 US 150, 153-54 (1972). But see *Alcorta* v *Texas, 355 US 28(1957),* setting the standard for that of false or misleading, where the false testimony

given was merely a "false impression" rather than actually perjured, Id. Cf. Giglio supra. Therefore, to establish a Due Process violation on such a claim, a petitioner must clear three hurdles:

1. Knowledge: The prosecutor knew, or should have known the evidence was false;
2. Falsity: The, testimony given at trial was false or misleading; and
3. Materiality: The false or misleading testimony was, in fact, material.

## DISCUSSION

Petitioner submits that his Fourteenth Amendment right to Due Process and a fundamentally fair trial were violated where, as demonstrated below, the prosecution knowingly introduced, and failed to correct, false testimony upon which to convict. Therefore, he is entitled to habeas relief. See *Giglio* 405 US at 154, quoting *Napue* 360 US at 271; see also *Chambers* v *Mississippi*,410US 284(1973) (holding that a defendant has a Fourteenth Amendment right to fundamentally a fair trial); *US Const. Am. XIV.* Under the Due Process Clause or the Fourteenth Amendment, criminal prosecutors must comport with prevailing notions of fundamental fairness. Prosecutors therefore have a constitutional obligation to report to the defendant and to the trial court whenever government witnesses lie under oath.

### A. **KNOWLEDGE**

To establish the knowledge requirement, a Petitioner need only demonstrate the prosecution "knew or should have known" the testimony presented was false. *Agurs*, 427 US at 103; *Kyles*, 514 US at 437. In *Giglio*, someone within the prosecutor's office knew of the false testimony although the prosecutor trying the case was not aware of the falsity. Here, it is apparent the State prosecutor "knew or should have known" given that it was established this witness was giving lies in response to questions being presented during direct examination by the prosecutor.

In his testimony, prosecution's key witness, Keith Nickerson vehemently denied receiving any leniency or compensation for his testimony against Petitioner. The prosecution established from the onset that he (State Prosecutor) had done nothing in favor of Nickerson's federal bank robbery case, that would result in any type of sentence reduction. See TT 12 pg. 225-226, 24142, 243-24).

However, the state prosecutor was well aware of the benefit Nickerson received being that he was directly responsible for Nickerson's compensation when reviewed in relevant part, the following:

"[Mr. Nickerson's] testimony proved to be instrumental in murder charges subsequently brought against (5) five individuals by the Michigan Attorney General... Undersigned counsel [for the Government] has spoken to Asst. Attorney General Dennis Pheney about [Nickerson's] assistance and was advised that the defendant was important witness in this case". See Keith Nickerson Sentencing Transcripts and 5k Motion pg. 2.

It is apparent that Mr. Pheney knew or should have known of the benefits Nickerson stood to receive, despite implying before the court and jurors that he would "do nothing for" Nickerson "in regards to any cases" he had pending. In fact, he asked Nickerson if there was "any benefit" that Nickerson knew of where he could receive for his testimony against Petitioner and Nickerson lied and said "NO" See TT vol. 12 pg. 225-226, 241.

This Court held in *Smith v Metrish,* 436 Fed Appx. 544 at 586, that Pheney was "under an obligation to disclose the perjury as soon as he learned of it". (6th Cir 2011). The prosecutor carefully limited his line of questions to infer to the jury that he "personally" had done nothing" on Nickerson's behalf to compensate him for his testimony. And Nickerson himself stood to gain nothing for his testimony as well. By itself, such cautious presentation of testimony might not have been so problematic because the prosecution was careful not to directly elicit outright false testimony.

But then Nickerson took this denial even further during cross-examination:

> [Defense Counsel]: And as a result of this 5K Motion filed by the Federal Government, you received a reduction down to 128 months, is that right?
> [Nickerson]: That is not why I got a reduction.
> [Defense Counsel]: You didn't get a reduction because of the 5K Motion by any chance?
> [Nickerson]; No, I didn't actually. See TT vol. XII pg. 244-247

It was at this juncture the State was to intervene, even after this exchange in its entirety, the prosecutor on re-direct, still failed to adhere to his constitutional obligation and allowed false testimony from a state's witness to stand uncorrected. Napue, 360 U.S. at 269. Indeed, the prosecution has an affirmative duty to correct testimony, and this duty specifically applies when the testimony concerns remuneration for a witness 's cooperation. See Giglio. 405 U.S. at 145-155.

Clearly the State prosecutor knew or should have known that Nickerson received compensation for his testimony, in fact, he was more than aware because he helped broker the deal. Knowledge has to the imputed to the prosecutor. Regardless of the lack of intent to lie on the part of the witness. Giglio and Napue require that the prosecutor apprise the Court when he knows that his witness is giving testimony that is substantially misleading and false.

To elaborate further under headnote "A. Knowledge" in this Petition, the Supreme Court quoted from the landmark New York Court of Appeals decision in *People v Savvides*, I N.Y. 2d 554, 557, 154, N.Y. S. 2d 885 (1956), in part, "the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. . . That the district Attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same. preventing, as it did, a trial that could in any real sense be termed fair. 360 U.S. at 269-70, 79 S. Ct. at 1177.

**B. FALSITY**

It is abundantly clear from Nickerson's Federal Sentencing transcript and the facts in this case, TT Vol 12. p. 244-246, that he testified contrary to what the Federal Judge placed on the record. Id. In addressing Petitioner's failure to correct perjured testimony claim, the Michigan Court of Appeals noted that "He [Nickerson] did indeed receive a benefit from the 5K Motion (which was based on his cooperation in the instant matter).. yet he unequivocally testified that he did not receive a reduction in his sentence. "Nickerson [I]s testimony was thus contrary to the actual facts" See. Id at pg. 13.

Petitioner has established that Nickerson's testimony is no "mere inconsistency" and that the testimony elicited at trial was "indisputably false" *United States v Lochmondy*, 890 F2d 817, 822 (6th Cir 1989) at 823. Stated differently, when a witness testifies "contrary" to or opposite of a set of facts, he or she is lying and not telling the truth concerning a matter, and while under oath doing so equates to committing perjury, and the "deliberate .deception of [a] court and jury by the presentation of testimony known to be perjured" violates a defendant's due process rights . See *Mooney v Holohan*, 294 U.S. 103, 112 (1935). Petitioner contends that on direct, cross, and re-direct examination of Nickerson's testimony, he continued to testify falsely while the prosecutor stood by and allowed the false testimony to go uncorrected despite trial counsel's vain attempts to get the prosecution's witness to tell the truth. Then a prosecutor merely suspects perjury, the prosecutor must at least investigate. The duty to act "is not discharged by attempting to finesse the problem by pressing ahead without a diligent and good faith attempt to resolve it, a prosecutor cannot avoid this obligation by refusing to search for the truth and remaining willfully ignorant of the fact." *Northern Marana Islands v Bowie*, 243 f3d 1109, 1118 (9th Cir. 2001).

Notably, this principle is supported by *Mooney*, *Napue*, and their progeny 's.

In Mooney, the Supreme Court held that a conviction obtained though "[a] deliberate deception of court and jury. . . is inconsistent with the rudimentary demands of justice". 294 U.S. at 112, 55 S. Ct. 340. The Court emphasized that the presentation of false evidence involves "A corruption of the truth seeking function of the trial process". Agurs, 427 U.S. at 103, 96 S. Ct. 2392. This "truth-seeking" function cannot be fulfilled when the state, knowing that a witness has perjured himself. proceeds without conducting an

investigation to ensure that the conviction is not obtained with false evidence warranting a new trial. _Bowie_, 243 F3d at 1117.

## C. MATERIALITY

To determine whether the prosecutor's use of the false testimony merits relief, entitling Petitioner to a new trial, materiality must be established when "there is a reasonable probability that prosecution's exploitation of the false testimony affected the verdict" _Napue_, 360 at 271-272.

Aside from the inconsistent and contradictory nature of eyewitness testimony given at trial, this was essentially a "creditability contest" in which both sides tried to bolster or attack the trustworthiness of the eyewitness accounts. Therefore, credibility was a dominant consideration in ascertaining guilt or innocence, other independent evidence pertaining to Petitioner came from two jailhouse snitches, a convicted perjurer/murder and two Indiana State Troopers who arrested Petitioner, credibility was particularly vital to the fact-finding process. And the false testimony clearly undermined the jury's ability to discern the truth in the circumstances. Though, not every contradiction is material and the prosecutor need not correct every instance of mistaken or inaccurate testimony. However, confessions and incriminating statements constitute perhaps the most compelling and most important evidence available to fact-finders in the justice system; s search for truth. _Arizona v Fulminante_, 499 U.S. 279, 296, 11 S. ct. 1246; 113 L, Ed 2d 302 (1991).

To be clear, Petitioner has established that Nickerson's testimony was material in accordance with the E. D. of Michigan Federal Courts decision where it held, "this court will grant materiality in favor of Foster" See _Foster v King_, Supra at 28. It has been well settled that a false statement is material" if the false testimony could in any reasonable likelihood have affected the judgement of the jury". _Brooks v Tennessee_, 626 F3d 878, 895 (6th Cir 2010). Napue, supra, at 271. Here, the prosecutor not only failed to correct Nickerson repeated denial of benefits he received for his testimony, which essentially claimed that Petitioner confessed to a crime, but the prosecutor undertook actions (or inaction) that clouded defense counsels efforts and the .jury's assessment of the evidence concerning Nickerson's credibility where a confession is highly prejudicial. Prevention of allowing the jury to decide a verdict based on truthful evidence sorely deprived Petitioner of a fair trial.

The second Circuit also has commented on the standard that applies in these cases, stating in part:

> Despite the fundamental nature of the injury to the justice system caused by the knowing use of perjured testimony by the State the Supreme Court has not deemed such errors to be "structural" in the sense that they "affect the framework within the trial proceedings... instead, even when a prosecutor elicits testimony he or she knows or should know to be false, or allows such testimony to

go uncorrected, a showing of prejudice is required. But the Supreme Court has been clear the prejudice is readily shown in such cases, and the conviction must be set aside... Unless there is no "reasonable likelihood that the false testimony could have affected the jury.
*Shih Wei su v Filion*, 335 F3d 119, 126-127 (2nd Cir. 2003)

Petitioner submits that the prosecutor in this case would have no advert intention to present such testimony, as a whole, had he not had a desired effect of a reasonable likelihood of affecting the outcome in favor of the prosecution, where Nickerson's evidence" at trial produced "a reasonable possibility that the evidence complained of might have contributed to [Petitioner's] conviction." *Chapman v California* 386 U.S. 18. 23 (1967) (quoting *Fahy v Connecticut*, 375 U.S. 85, 86-87 (1963).

Nickerson's testimony became paramount given the quality of testimony provided by the witnesses named by the District Court, as explained in detail further in this Petition.

Viewed objectively, the totality of evidence introduced at trial against Petitioner consisted of highly controversial and contested eye-witness testimony that was inconsistent, and contradictory on many material points. Points the jury in this case struggled with where it initially announced that it could not reach a unanimous verdict during deliberations. See, e.g. *Chapman v California*, 386 U.S. 18, 22-23 (1986).

**1. COURTS RELIANCE ON "SIGNIFICANT OTHER EVIDENCE" IN THEIR DENIAL OF PETITIONERS FAILURE TO CORRECT KNOWN PERJURED TESTIMONY IS AN UNREASONABLE DETERMINATION OF WELL ESTABLISHED FACTS.**

The Appeals Court for the State of Michigan usage of what it termed "Significant other evidence" that Petitioner could be "held culpable" for Boothby's death, simply because of his alleged participation in "stomping and kicking her in the head" is an unreasonable determination of clearly established facts established from the trial court record. See *Foster*, 20123 WL 4033639, at 13. See also, Michigan Court of Appeals decision, 301361 unpublished, august 8, 2013, pg. 9. paragraph 4. Moreover, the Appellate Court also made reference to Petitioner's alleged involvement in Boothby's "beating" in its conclusion, denying his perjured testimony claim. Id at pg.13. paragraph. 4.

Furthermore, the Federal District Court agreed with the Appeal Court in its assessment of the trial court record in also denying of Petitioner claim of failure to correct known perjured testimony. See, *Foster v King*, 2023 U.S. Dist. LEXIS 151306 at 27, paragraph 3.

Here 2254(d)(2) applies to questions of facts and asks whether a state court decision was based on unreasonable determination of facts in light of the evidence presented. See, *Maxwell v Roe*, 628 F3d 486 (9th Cir. 2010).

A Federal Court may take into account only the record that was before the State Court, that adjudicated the claim on the merits when evaluating an AEDPA claim under 2254(d0. See *Rice v White*, 660 f3d 242-250, (6th Cir 2011).

Petitioner, also has the burden of rebutting the presumption of correctness by clear and convincing evidence. The presumption of correctness also applies to factual findings made by a State Appellate Court based on the Trial Court record. *Williams v Beyley*, 380 F3d 932, 941 (6th Cir. 2004).

a. **The State Appellate Court and the Federal District Court determinations were objectively unreasonable.**

Taking into account, all relevant, available, and creditable evidence, while under oath provided by the states own Medical examiner on record. It is not disputed that both medical examiners testified in open court that the small bruise discovered by Dr. Waldemir Palutke during autopsy, was not and is not "fatal or life threatening".

The testimonial evidence advanced the following inquiry during direct examination of Dr. Palutke; in relevant part:

> Q. The contusion you mentioned, you said the cortex?
> A. Yes
> Q. Is that bruising to the brain?
> A. Yes
> Q. A bruise to the brain, that injury itself, could it be fatal?
> A. This small bruise could **NOT** have been fatal by itself.
> Q. Now doctor, before you get to the specific injuries, the injuries that you have noted to the head from the neck up, would those be consistent with her being hit or run over by a cars actual tires going across her head?
> A. Yes

The States prosecutor followed up with the following question concerning a possible blow to the head:

> Q. Is that a serious injury?
> A. in and of itself, No, but it represents a severe blow to the head.

see TT Vol. Xl pg. 214 (emphasis Added)

Petitioner therefore contends that by clear and convincing evidence of the trial court record, the Michigan Court of Appeals decision and determination, as well as the Federal District Courts reliance upon the aforementioned facts, were not only wrong but are objectively unreasonable. One, Boothby wasn't killed by or from a "beating" or assault and there isn't any evidence presented at trial to support the courts

conclusion that Petitioner could have been held culpable for her death because of any injuries she may have accumulated from being assaulted, they were determined to be "non-fatal" and "non-life-threatening".

## II. THE TRIAL COURT AND FEDERAL DISTRICT COURTS UNREASONABLY APPLIED DEFENCE COUNSELS QUESTIONS TO WITNESSES AS EVIDENCE THE JURY COULD CONSIDER CONTRARY TO SUPREME COURT PRECEDENCE AND DESPITE TRIAL COURT INSTRUCIIONS.

Contrary to the standard employed by the Supreme Court in _Napue_ and _Giglio_, the Michigan Court of Appeals and the Federal District Court, when addressing this claim, failed to inquire whether the "any reasonable likelihood" Standard applied in this case. _Napue_, 360 at 271. Giglio, 465 U.S. at 154.

Instead, the courts focused primarily on the actions and questions posed to Nickerson on cross-examination by trial counsel. See 2013 WL 4033639 at pg. 12-13. Stating, "defense counsel's cross-examination called Nickerson's credibility even more into question." And the District Court held that, "it agrees with the Michigan Court of Appeals that defense counsel raised the falsity before the jury, which "decreased" the likelihood. . . and" that much of the false testimony was corrected by defense counsel" See, 2023 Dist. 151306 at 27.

Not only does such an approach by the courts contravene the directives of the Supreme Court, it also totally disregards instructions given to jurors by the trial court, where it specifically instructed the jury that it could "only consider the evidence that was properly admitted in this case. "which consist solely of the sworn testimony of witness". See TT vol. 12 pg.19; See also CJI 2nd 2.5, CJI 2d. 2 .7; CJI 3-5 (2) and (5).

Notably, it has been well known and established Supreme Court precedent that "jurors are presumed to follow their instructions. "therefore, in crediting defense counsel's cross-examination with somehow "presenting the pertinent facts" that "decreased" the likelihood of affecting the verdict or cured the impropriety, has been rebutted by and contrary to cases such as _Richard v Marsh_,481 U.S. 200 (1987), _Jones v United States_, 527 U.S. 373 (1999). and _Cooper v Haas_, 2018 U.S. App LEXIS 28987.

Moreover, the relevant Legal determination to be applied is completely at odds with both courts analysis and rulings. As neither *Napue* or *Giglio* created an exception for a Courts discretion to deviate from the legal authority to be applied in this context where defense counsel has attempted unsuccessfully, to get a prosecutor's witness to testify truthfully regarding a material matter. Id. Furthermore, there isn't "a rule. . . declaring [a] prosecutor, may hide, and defendant must seek… "in a system constitutionally bound to afford defendants due process, _Banks_ 540 U.S. at 696. (Rejecting argument that the prosecution can lie and conceal and the prisoner still has the burden to... discover the evidence so long as the potential existence' of a prosecutorial misconduct claim might have been detected".) Nor is there any language in any

of the landmark cases or their progeny's that suggest a prosecutor is absolved of his constitutional obligation to correct testimony that he knows to be false. See *Napue*, 360 U.S. at 2711; *Giglio*, 405 U t S. at 153-154.

To be clear, what has been overlooked here is the fact that Nickerson vehemently testified that no one had offered to help him. . . that he didn't expect any help for his testimony and. that the State prosecutor hadn't offered any compensation or help in any of the legal situations Nickerson may have had pending. Mr. Pheney thought it was extremely important to establish for the jury that no official source connected to himself or his office had promised Nickerson any consideration which was made clear by his redirect examination, which was the last testimony given from Nickerson and heard by petitioner's jury.

The fact that trial counsel tried to convey the truth matters little when Nickerson continued to give answers that where not reflective of the truth. The Napue Court held that "we do not believe that the fact the jury was apprised of other grounds for believing that the witness may have had an interest in testifying against Petitioner, turned what was other-wise a tainted trial into a fair one". *Napue* 360 U.S. at 270-271.

a. **PREJUDICE (CONFESSION EVIDENCE)**

A confession is an admission of guilt and culpability of a defendant. .Rather, no distinction may be drawn between inculpatory statements and statements alleged to be merely exculpatory because if a statement made by a defendant were in fact truly exculpatory in nature, it would never be used by the prosecution. See *Miranda v Arizona*, 384 U.S. 436 (1966). See Also *Bram v United States*, 168 U.S. 532 (1897).

Here, the State's case relied primarily on statements purportedly made by Petitioner. The State not only presented perjured testimony from Nickerson, but testimony from impeached jailhouse snitch Michael Smith, also testimony from Indiana State Troopers that offered alleged statements made by Petitioner that were taken out of context to imply guilt.

In *Bruton v United States*, 391 US 123, 140 (1968), the Supreme Court warned against permitting a jury to hear a co-defendants confession implicating him, that its so severe that the Court must assume the jury's inability to heed a limiting instruction, and that -- "the defendants own confession is probable the most Probative and . damaging evidence that can be admitted against him. Though itself an out-of-court statement it is admitted as reliable evidence because it is an admission of guilt by the defendant and constitutes direct evidence of facts to which it is related - Even testimony of an eyewitness maybe less reliable than the defendants own confession."

and in *Watkins v Sowders*, 449 U.S. 341, 352 (1981) the Supreme Court observed --

> [Eyewitness] testimony is likely to be believed by jurors, especially when it is offered with a high level of confidence, even though the accuracy of an eyewitness and the confidence of that witness may not be related to one another at all. All the evidence points rather strikingly to the conclusion that there is almost nothing more convincing than a live human being who takes the stand, points a finger at the defendant, and says, "That's the one!"

Furthermore, the Supreme Court has recognized that the absence of any physical evidence, "[the jury's] estimate of trustworthiness and reliability of a witness may well be determinative of guilt or innocence". *Blackston v Rapelje*, 780 f3d 340, 355 (6th Cir. 2015), (Citing *Napue*, 360 U.S. at 269) In this case, Nickerson "pointed a finger" before Petitioner's jury and stated that "he told me he did it" without having had his credibility fully or properly evaluated, Had the jury been apprised of the true facts concerning why he would testify as he did, the jury might have concluded that Nickerson had "fabricated testimony in order to curry favor of the very representative of the State who was prosecuting the case Nickerson was testifying for". Nickerson was more than aware of any future benefits he might have received beyond compensation; he had already received up to date. *Napue*, 360 U.S. at 271.

The State Prosecutor in this case was well aware of the impact confession evidence has in a case where it is essentially a "credibility contest". Where confessions are generally considered strong evidence of guilt and a "sound .confession alone may significantly influence a jury's decision." *Murray v Earie*, 405 F3d 278 (5th Cir 2005) That Court further held that "Confession evidence" (regardless of how it was obtained) is so biasing that juries will convict, on a basis of confession alone".

If the prosecutor didn't intend for Nickerson's testimony to have a "substantial and injurious effect or influence on the jury's verdict", why would he go through such lengths to secure testimony? Going so far as to vouch for Nickerson in his Federal bank robbery case, granting him "substantial assistance" in his 5K Motion. Why didn't he fulfill his constitutional obligation by correcting the false testimony given by his witness? Mr. Pheney deliberately set the stage for Nickerson to lie on the stand about any benefits he had already received and the State Prosecutor was more than aware of such when he initiated his direct-examination of Nickerson, this type of conduct involving dishonesty, fraud, deceit, misrepresentation, in order to obtain a conviction, is highly prejudicial to the administration of justice. Unfairness or corruption of any magnitude of the prosecution in performance of administrative function in civil or criminal cases in State Court violate the Fourteenth Amendment as well Petitioner's rights to Due Process.

In this case, the State relied heavily on the fact that a successful prosecution depended on the jury believing the "confession evidence" presented by the two "jailhouse snitches" Smith being sufficiently impeached, place the prosecutor in a position where he Was forced to allow Nickerson's perjury to stand

uncorrected in order to obtain a conviction. Without Nickerson, it is unlikely that Petitioner would have been convicted. There was no physical evidence linked to Foster and the circumstantial evidence, alone, would have been insufficient to convict.

In *Freeman v Trombley*, 744 F. Supp. 2d 607 (2010), a juror, from his trial, was interviewed after trial, in connection as to why she found Freeman guilty. She stated in relevant part: "Another juror said it was the testimony of Phillip Joplin (the "Jailhouse snitch" in Freeman's case) that convinced her of Freeman's guilt, "because they shared a cell together for two hours", and that "because Joplin testified that Freeman confessed to him", and the juror believed him. This speaks to the power "Jailhouse snitches" confession evidence holds in OUR judicial system. The only power we have to defend such testimony is to reveal their intentions to curry favor for their testimony and even then the Supreme Court has held:

> " A confession is like no other evidence. The defendant's own confession is probably the most, probative and damaging evidence that can be admitted against him. The admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information certainly, confessions have [a] profound impact on the jury, so much so that the courts may justifiably doubt, its ability to put them out of mind even if told to do so". *Arizona v Fulminante*, 499 U.S. 279, 111 S. Ct. 1 246, 11 3 L Ed 2d 302 (HN4)

The Court also held that "Constitutional error may not be found harmless if the error deprives [the] defendant of the basic protection [without which] a criminal trial cannot reliably serve its function as a vehicle for determination of quilt or innocence". *Fulminante*, 499 U.S. at 296 (quoting *Rose v Clark*, 478 U.S.570, 577-78, 92 LEd 2d 460, 106 S. Ct 3101 (1956).

1. TESTIMONIAL STATEMENT FROM "A FEW NOTABLE WITNESSES"

**a Jailhouse Snitch Michael "Flame" Smith**

Not only did the prosecution present Keith Nickerson, but expanded its investigation to locate and present the testimony of another purposed Jailhouse Snitch who was a self-proclaimed "paralegal" who worked inside the Marion County Jail's law library in Indiana. Smith locked on the same housing block as Petitioner; and was sufficiently impeached by trial counsel where Smith's intentions to curry favor for his testimony against Petitioner in exchange for possible early release from prison, as well as a favorable recommendation at his parole hearing. All were made readily known before Petitioner's jury by Smith's own admission. Smith also admitted to having in his

possession numerous Supplemental Police Reports pertaining to testifying witnesses in this case, including copies of reports and multiple interviews given by Adrienne Burnette. See TT Vol. XII pg. 178-179, 188-190; Id at 191 -202,203,205,207.

### b. **Convicted Perjurer/ Adrienne Burnette**

Testimony from prosecution's key eye-witness, Adrienne Burnette, who was subsequently charged with perjury and 2nd Degree murder for her role in the death of Debra Boothby. Burnette testified in open Court to continuously giving false testimony concerning material aspects the case, including during preliminary examination and throughout the course of trial. Burnette testified that, was fed Petitioner's name by law enforcement; despite initially disagreeing with authorities concerning his involvement, she admitted to using petitioner's name "as a way out" of her involvement in Boothby's murder. See TT vol. X pgs. 238-241 See also TT X pgs. 17-22.

### **Petitioner 's Testimony**

In addition, Petitioner took the stand on his behalf and gave detailed accounts ranging from his hatred of Scottie Shaver to the tragic death of his Wife in early (2009). Petitioner also explained for the jury, the full context of his line of questions presented to the Indiana State Troopers after what he thought was his being "detained for questioning" when in fact, he had been placed under arrest. Petitioner went on to explain that he was simply trying to confirm the rumors that had been circulating about the arrest of Scottie Shaver and Burnette who had been long rumored as primary suspects associated in Boothby's death from the very onset in 1998. Petitioner, during his interview with then Sgt. Allen of Covert PD, suggested as much when asked by Sgt. Allen "who" should he be investigating? Petitioner exclaimed "Scottie and Adrienne!" See TT Vol. XII. pgs. 104-106, 117-118, 150-151. See also TT Vol. XII pg. 275-276, testimony from Julian Allen.

To reiterate, Petitioner's point, for further clarification to this Honorable Court, that may not be aware of certain particular facts surrounding this case... Petitioner and Co -Defendants weren't a group of "friends" that went out one Saturday night to a bar to enjoy themselves in the mist of each other's company, and somehow ended up in a murder/ kidnapping plot! Petitioner barely knew of Gill and Burnette, and despised both Shaver men.

To give this Honorable Court a sense of the underlined hatred between petitioner and Scottie Shaver; since being incarcerated, Shaver had Petitioner assaulted and stabbed While the two were at Saginaw Regional Correctional Facility in 2014. Petitioner had no previous knowledge, or association with Ms. Boothby other than seeing her at the bar that night.

See TT Vol. XV @ pg. 30, 33.

Whatever transpired that night between Ms. Boothby and Petitioner's Co-defendants; Mr. Foster was not involved, nor aware of what took place.

### 1.THE STATE COURT' S DECISION IS CONTRARY TO SUPREME COURT PRECEDENT AND AN UNREASONABLE APPLICATION OF FEDERAL LAW.

a. It is thus wel1-settled that conviction obtained by the knowing use of false and/or perjured testimony is fundamentally unfair, must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury United States v Agurs, 427 U.S. 97 (1976); See Also: Napue v Illinois, 300 U.S. 264 (1909); Coe v Bell, 161 F3d 320, 343 (6th Cir.1998).

In resolving Petitioner's failure to correct known false testimony claim, the Michigan Appeals Courts determination was entirely consistent with the sufficiency of evidence claim associated with ***Jackson v Virginia***, 443 U.S. 307 (1979) where it, examined "other evidence to support the conviction instead asking if there was "any reasonable likelihood the false testimony could have affected" Petitioner's verdict which is contrary to and an unreasonable application of ***Napue, Giglio*** and their progeny's .

The Court focused primarily on its' view of "significant other evidence concerning Petitioner's alleged participation in at least the beating of Boothby" which has already been previously discussed as an unreasonable determination of facts Where Petitioner could not have been held culpable for Boothby's death by such analysis.

Moreover, the Court's statement that "had Nickerson's testimony been the only evidence against defendant" misses its mark where the Court failed to adhere to the any "reasonable likelihood" standard which is applied in such cases. That there was other evidence to convict does not upset the standards announced in ***Napue*** or ***Giglio*** where the first part of a Court's inquiry relates to whether there has, in fact , been Governmental misconduct was present (which clearly the Appeals Court failed to do) the Court should have gone to the second part of the test and considered whether a new trial is mandated because there is a 'reasonable likelihood' the testimony presented by Nickerson , could have affected the judgment of Petitioner's jury. See *Giglio*, 405 U.S. at, 151 - 154.

Furthermore, the Michigan Court of Appeals failed to apply and include the language and perspective of *Giglio* where the "reasonable likelihood" Standard focuses on the impact of the false testimony could have had on the "trier of facts estimation of [ the witness] credibility;" not on whether there was other evidence to convict.

Had Nickerson confirmed, as a witness from the stand, any of the assertions by defense counsel, those confirmations would have possibly constituted evidence. But Nickerson vehemently denied receiving any benefit for his testimony against petitioner when asked by the State Prosecutor and defense counsel. Defense questions to Nickerson are not evidence petitioner's jury could consider. The trial Court properly instructed the jury that "evidence includes only the sworn testimony of witnesses and exhibits admitted into evidence" and, among other things, "the lawyer's questions to witnesses are NOT evidence" and should be considered "only as they give meaning to the witnesses". There is no evidence from which a reviewing court can conclude that the jury was unable to follow its instructions, therefore defense counsel's cross-examination had no effect in curing Nickerson's false testimony. The Supreme Court has held that unless there is an "overwhelming probability" that the jury will be unable to follow the [trial] courts instructions; juries are presumed to follow their instructions. Greer v Miller, 483 U.S. 756,766 n.8., 107 Sct. 3102; 97 L.Ed 2d 618(1987), See also United States v Hynes, 467 F3d 951,957 (6th Cir. 2006).

**II**

**PETITIONER CONTENDS THAT THIS CASE WAS CLOSED DURING DELIBERATIONS THE JURY ANNOUNCED IT WAS "DEADLOCKED" AT ONE POINT BEFORE REACHING A GUILTY VERDICT.**

**b.** The evidence associated with Petitioner's involvement in this case was not overwhelming, and encountered difficulty reaching its verdict. As Petitioner argues, there was no physical evidence attributed to him. There was no DNA evidence associated with him in the case, and there was no evidence established of motive for Foster to involve himself in the murder of someone he didn't know with two individuals he didn't associate with and two more individuals he did not like. see TT XV, pg. 39-40 See also: States Prosecutor ' s closing argument. The prosecution stating "it doesn't know why" Petitioner would involve himself in this case other than he wanted to. Moreover, the jury deliberated for some 14-15 hours, and after 8-9 hours into deliberation, announced to the court that it was unable to reach a verdict. See: TT Vol. XXIII

pg.16. Before going home for the weekend, the jury was given an **Allen** instruction and on the following Monday, it deliberated another 4 hours before returning a guilty verdict.

Petitioner's case was close. The Prosecutor's case primarily rested on less than reliable witness testimony comprised of two jailhouse snitches one of who committed flat-out, perjury, another one, sufficiently impeached a convicted perjurer/ murder who admittedly, never told the truth in order to save themselves. The District Court bolstered the testimony of the two Indiana State Troopers to imply admission of guilt on Petitioner's behalf, where his questions to troopers were taken out of context. The inconsistent, contradictory nature of the eye witness testimony given at trial speaks for itself, "when determining whether the evidence established the defendants' guilt beyond a reasonable doubt, the jury naturally weighs the probability that the evidence is true". See: *Holland v United States*, 348 U.S. 1 21 (1954). Where a jury establishes it is deadlocked in reaching a unanimous verdict, during the course of its' deliberation, Circuit Courts across America have concluded that such cases are determined close, e.g. *Chapman v California*, 386 U.S. 18, 22-23; 17 L.Ed . 2d 705; 87 S. Ct. 824 (1967). See also: *United States v. Jean Baptise,* 166 F3d 102 (2nd Cir.1999) (holding the fact a jury initially was deadlocked and reached a verdict only after receiving an ***Allen*** charge may support an inference that the case was close".) *United States v Howell*, 285 F3d 1283 (10th Cir. 2002 citing the same). In fact, the Sixth Circuit held that "A verdict or conclusion only weakly supported by the record is more than likely to have been affected by errors than one with overwhelming support". *United States v Smith*, 980 F. Supp. 2d at 868 (6th Cir. 2013).

Significantly, by announcing that they were deadlocked prior to reaching a verdict, the jury signaled that it was not fully persuaded the evidence placed before it held sufficient grounds to convict. Defense counsel called no witnesses other than Petitioner and no prevailing theory other than Burnette was a liar and his client was not present during the commission of the crime because Petitioner had been a long standing enemy of the Shavers. Credibility was of paramount concern.

To be sure where the jury is "on the fence", and the case against the Defendant depends on the credibility of a given witness... it is objectively unreasonable for the appeals Court to conclude that any false testimony concerning Nickerson's credibility as a State witness, presenting "confession evidence" to Petitioner's jury, as a whole did not prejudice Mr. Foster as the Defendant. (See *Hodgson v Warren*, 622 F3d 591 600-601 (6th Cir.2010). Considering the likely impact of such testimony affecting the judgment of the jury, involved a blatant violation of "fundamental concepts of justice" entitled to Petitioner. (See *Jones v Kentucky* 97 F2d 335, 338 (6th Cir. 1938). This is

even more substantially true in a case like this one where the jury announced it was deadlocked before reaching a verdict". *People v Lafler*, F3d 503 at 51 7.

## III
## DUE PROCESS ANALYSIS

**c.** Petitioner contends that the corrupting impact of false testimony on the Justice System is profound and corrosive. The United States Supreme Court has long-since held that the due process clause is in place to protect against such convictions as this one, that are based on testimony the prosecutor knew or should have known was false. See *Taylor v Illinois*,484 U.S.400,416 (1988) (holding that there is no constitutional right to present false evidence). *United States v LaPage*, 231 F3d 1488 ,492 (9th Cir. 2000) (Commenting that perjury pollutes a trial).

Due Process protection is triggered when Petitioner established that the State Prosecutor acting with the requisite degree of knowledge, allowed materially false testimony to stand uncorrected. Petitioner has correctly addressed the Courts' decisions critical to the aspect of due process protection. First, he has properly defined the appropriate level of prosecutorial knowledge necessary for a due process claim. Second, he has clarified the falsity requirement. Third, petitioner has defined, in grave detail, the correct level of harm he MUST establish to get relief, focusing on the requirement of "materiality". See 405 U.S. at 152. See also Bagley, 473 U.S. at 679 n.9.

Petitioner, who is a "layman" at the law and a "novice" in litigation, has attempted to the best of his ability, by the Grace of God, to convey to this Honorable Court that false and/or perjured testimony was improperly used at his trial and has argued that there is a reasonable likelihood that the falsity had an impact on the outcome on his verdict. To be clear, a conviction obtained by the knowing use of perjury is deemed "fundamentally unfair" by the Supreme Court. Moreover, false testimony cases involve prosecutorial misconduct. Additionally, and more importantly, they involve "a corruption of the truth -seeking process". *Agurs*, U.S. at 103-04. The Court also stated that the standard "must reflect our overriding concern with the justice of the finding of guilt", concerning the due process implication of false testimony. Continued enforcement of this protection, based on the holdings and special concerns that arise in false testimony cases, is critical.

It is clear and obvious that the knowing use of perjured testimony has violated Petitioner's right to Due Process. The Prosecutor had both an ethical duty and a Constitutional obligation to correct testimony which he knows to be false.

See MODEL RULES OF PROFESSIONAL CONDUCT RULE 3.3(2010) (establishing a duty of candor to the tribunal which includes the obligation to refrain from presenting false evidence); See also: *Saktzburg,* Supra note 13, at 1577-78 (discussing ethical obligation not to present false testimony). However, despite these clearly established obligations, the Prosecution in this case, knowingly allowed false testimony of his witness to stand uncorrected. This type of conduct amounts to deliberate deception and should be viewed as violating Petitioner's Right to Due Process.

**IV. Fundamentally Unfair / Equitable Jurisdiction**

The testimony given by Keith Nickerson by all accounts fit the criteria under the Due Process Clause of "fundamentally unfair" and to set the record straight, a new trial is warranted.

The term "fundamentally unfair" is a term indicating a type of evidence that is so extremely unfair that its admission violates "fundamental concepts of justice". Dowling v United States, 493 U.S. 342, 352; 110 S. Ct. 668; 107C Ed 2d 708 (1990). (quoting United States v Lovasco, 431, U.S. 783, 790; 97 S. Ct. 2044 52 L. Ed2d 752 (1977).

A Due Process challenge will succeed only where a "species of evidence" violates those fundamental conceptions of justice which lie at the base of our civil and political institutions, and define the community's sense of fair play and decency. Lovasco, 431 U.S. at 790 (Citing *Napue v Illinois,* 360 U.S. 264, 269 (1959). That Court held that the prosecutors "knowing use of false evidence "violates any concept of ordered liberty" "which is exactly the type of species of evidence" the Supreme Court deemed to have violated Petitioners Due Process right to fair trial, with foul play.

Besides severely affecting fundamental fairness, this issue speaks to the integrity and public reputation of judicial proceeding, independent of Foster's guilt or innocence. See *Olano*, 507 U.S. 725, 736-737, (1993) The law in our judicial system, at one time, used to abhor perjury and false testimony on the stand in its courtrooms. Now it seems as if our legal system has come to embrace perjury by finding every excuse imaginable to give way to false evidence by rewarding Jailhouse snitches testimony with time reduction and turning a blind eye to prosecutors who use false testimony to convict.

The corrupting impact of false testimony on the justice system is profound and corrosive, there is no constitutional right to present false testimony under any circumstance, especially where there lies the likelihood that the false testimony may have impacted the jury's verdict.

This Petitioner therefore respectfully invokes the Equity Jurisdiction of Power instilled in this Honorable Court to Administer justice according to fairness, justness, and right dealings which regulate the granting of equitable remedies which are of such fundamental importance as to require compliance with

Due Process standards of fairness and justice. Embodied in this Courts Power is the concept of Petitioner's basic rights in a criminal proceeding. Under which the presumption of innocence and proof of guilt must be proven by legally obtained evidence before an impartial jury without influence supported by tainted evidence.

This Honorable Court, having equitable jurisdiction over both legal and equitable matters. Petitioner therefore seeks equitable relief in the presence of justice, being fair, right, and equitable exercise of power

Respectfully Submitted,

________________________

Mr. ED D. Foster #226862
E.C. Brooks Corr Facility
2500 S Sheridan Dr.
Muskegon, Mi 49444

US POSTAGE
ZIP 49444 $ 002.59
02 4R
0000380111 MAY 31, 2024

RECEIVED
JUN 04 2024
KELLY L. STEPHENS, Clerk

Clerk of The Court
United States Court of Appeals for The Sixth Circuit
100 E. 5th St. Rm # 540
Potter Stewart U.S. Courthouse
Cincinnati, Oh 45202-3988

U.S. MARSHALS SERVICE
X-RAY ✓

23-1891
MMP

RECEIVED

JUN 04 2024

KELLY L. STEPHENS, Clerk

ED D. FOSTER, #266862
ERNEST C. BROOKS CORRECTIONAL FACILITY
2500 S. SHERIDAN DR.
MUSKEGON, MI 49444

May 31 ,2024

Clerk of the Court
United States Court of Appeals
For The Sixth Circuit
100 East Fifth Street, Room 540
Potter Stewart U.S. Courthouse
Cincinnati, Ohio 45202-3988

**RE:** Case No. **23-1891**
*FOSTER v. KING*
District Court No. 15-cv-12265

Dear Court Clerk:

Enclosed please find an original and four (3) copies of the following:

1. Appellants Brief
2. Proof of Service by First Class Mail;
3. Notarized Statement of Depositing Motion Pursuant to FRAP 25(a)(2)(C);
4. Attachments and/or exhibits.

Please file in your usual manner. If there is anything else that I need to do please let me know.

Thank you for your time and consideration.

Sincerely,

# 266862

ED D. FOSTER
Petitioner-Appellant *in Pro Per*
ERNEST C. BROOKS CORRECTIONAL FACILITY
2500 S. SHERIDAN DR.
MUSKEGON, MI 49444

Enclosures

MICHIGAN DEPARTMENT OF CORRECTIONS
**DISBURSEMENT AUTHORIZATION (EXPEDITED LEGAL MAIL – PRISONER)**

RECEIVED
JUN 04 2024
KELLY L. STEPHENS, Clerk

CSJ-318
REV. 11/15 4835-3318

**Please PRINT clearly, illegible and/or incomplete forms will not be processed.**

Lock A-527 Institution URF

Prisoner Number 226862 Prisoner Name (Type or Print Clearly) Foster

[x] Legal Postage [ ] Filing Fee $ [ ] Certified Mail (Must Be a Court Ordered Requirement)

[ ] New Case [x] Case Number 23-1891

Pay To USPS

Mailing Address Clerk of the Court United States Court of Appeals 6th Cir. 100 E. 5th St. Rm# 540 Potter Stewart U.S. Court House. Cincinnati, Oh 45202-3988

**The Following Section Must Be Completed In Authorizing Staff Member's Presence**

Prisoner Signature [signature] Date & Time Submitted 5-31-24 10953

Received by (Type or Print Name & Title) Hoffman RC Staff Signature [signature]

Date &Time Received by Authorizing Staff 5-31-24 0952

**Authorization Denied**

[ ] Does not meet definition of legal mail or court filing fee as identified in OP 05.03.118

[ ] Not hand delivered to authorizing staff member

[ ] New case or case number not on form

[ ] Does not include court order for handling as certified mail

[ ] Other (explain)

[ ] Prisoner refused to sign & date in staff member's presence

Denied by (Type or Print Name & Title) Signature

**Section Below to be Completed by Mail Room Staff**

Placed in Mail by (Type or Print Name & Title) Signature

Postage Amount $ Date Placed in Outgoing Mail

**Only Business Office Staff are to Write in the Section Below**

Postage $ Total Obligation $ [ ] Court Filing Fee Denied Due to NSF

Filing Fee $ Check #

Date Copy Sent to Prisoner

Processed by (Type or Print Name & Title) Signature

DISTRIBUTION: [ ] Prisoner Accounting [ ] Prisoner [ ] Counselor's File [ ] Prisoner

Mr ED D. Foster # 226862
E.C. Brooks Corr Facility
2500 S. Sheridan Dr.
Muskegon, Mi 49444

US POSTAGE
ZIP 49444 $ 002.59
02 4W
0000388111 MAY 31 2024

RECEIVED
JUN 04 2024
KELLY L. STEPHENS, Clerk

Clerk of The Court
United States Court of Appeals for The Sixth Circuit
100 E. 5th St. Rm # 540
Potter Stewart U.S. Courthouse
Cincinnati, Oh 45202-3988

X-RAY ✓
U.S. MARSHALS SERVICE

23-1891
MHP