No. 23-1891

---

In the
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

---

ED D. FOSTER,

Petitioner-Appellant,

v.

CHRIS KING,

Respondent-Appellee.

---

Appeal from the United States District Court
Eastern District of Michigan, Southern Division
Honorable Laurie J. Michelson

---

**BRIEF FOR RESPONDENT-APPELLEE**

---


Dana Nessel
Michigan Attorney General

Ann M. Sherman (P67762)
Solicitor General

Jared D. Schultz
Assistant Attorney General
Co-Counsel of Record
Attorneys for Respondent-Appellee
Criminal Appellate and Parole Appeals Division
P.O. Box 30217
Lansing, MI 48909
517-335-7650


Dated: August 5, 2024

# TABLE OF CONTENTS

Page

Table of Authorities ........ ii

Statement Regarding Oral Argument ........ v

Jurisdictional Statement ........ 1

Statement of Issue Presented ........ 2

Introduction ........ 3

Statement of the Case ........ 4

Standard of Review ........ 14

Summary of Argument ........ 14

Argument ........ 16

I. The Michigan Court of Appeals reasonably determined that Nickerson's false testimony did not affect the outcome of Foster's trial. ........ 16

Conclusion and Relief Requested ........ 27

Certificate of Compliance ........ 28

Certificate of Service ........ 29

Designation of Relevant District Court Documents ........ 30

## TABLE OF AUTHORITIES

Page

**Cases**


*Brady v. Maryland*,
373 U.S., 83 (1963) ........ 19

*Brecht v. Abrahamson*,
507 U.S. 619 (1993) ........ 26

*Brown v. Davenport*,
596 U.S. 118 (2022) ........ 26

*Chapman v. California*,
386 U.S. 18 (1967) ........ 26

*Coe v. Bell*,
161 F.3d 320 (6th Cir. 1998) ........ 19

*Cullen v. Pinholster*,
563 U.S. 170 (2011) ........ 18

*Fleming v. Metrish*,
556 F.3d 520 (6th Cir. 2009) ........ 14

*Giglio v. United States*,
405 U.S. 150 (1972) ........ 18, 19, 20, 21

*Glebe v. Frost*,
574 U.S. 21 (2014) ........ 17

*Harrington v. Richter*,
562 U.S. 86 (2011) ........ 17, 18

*Hill v. Curtin*,
792 F.3d 670 (6th Cir. 2015) ........ 17

*Kernan v. Cuero*,
583 U.S. 1 (2017) ........ 17, 18

*Marshall v. Rodgers*,
569 U.S. 58 (2013) ........ 17

*Napue v. Illinois*,
360 U.S. 264 (1959) ........ 18, 19, 20

*People v. Foster*,
847 N.W.2d 243 (Mich. 2014) ........ 12

*People v. Foster*,
No. 301361, 2013 WL 4033639, at *10 (Mich. Ct. App. Aug. 8, 2013) ........ 11, 12

*People v. Shaver*,
2013 WL 4864204, at *2 (Mich. Ct. App. Sep. 12, 2013) ........ 10

*Smith v. Davis*,
No. 23-3604, slip op. at 34 (6th Cir. Jul. 31, 2024) ........ 25

*United States v. Lochmondy*,
890 F.2d 817 (6th Cir. 1989) ........ 19

*United States v. Warren*,
37 F. App'x 88, 2002 WL 971531, at *1 (5th Cir. 2002) ........ 23

*Wiggins v. Smith*,
539 U.S. 510 (2003) ........ 18

*Woodford v. Visciotti*,
537 U.S. 19 (2002) ........ 25

**Statutes**

28 U.S.C. § 1291 ........ 1

28 U.S.C. § 2253 ........ 1

28 U.S.C. § 2254 ........ 1, 4, 12

28 U.S.C. § 2254(d) ........ 17

**Rules**

Fed. R. App. P. 34(a)(2)(C) .......................................................................... v

## STATEMENT REGARDING ORAL ARGUMENT

The State does *not* request oral argument. The "facts and legal arguments are adequately presented" in this brief, and "the decisional process would not be significantly aided by oral argument." *See* Fed. R. App. P. 34(a)(2)(C). As such, for the reasons discussed in this brief, this Court should affirm the district court's decision denying habeas relief without oral argument.

## JURISDICTIONAL STATEMENT

Ed Foster appeals the district court's August 28, 2023, final order denying his petition for a writ of habeas corpus. (8/28/23 Op. and Order, R. 26, Page ID # 6428.) The action was subject to the district court's jurisdiction under 28 U.S.C. § 2254. Although denying relief, the district court issued a certificate of appealability (COA) as to Foster's claim that he was denied due process because perjured testimony was used to obtain his conviction. (8/28/23 Op. and Order Granting COA, R. 27, Page ID # 6430.)

Foster timely filed a notice of appeal on September 14, 2023. (9/14/23 Notice of Appeal, R. 29, Page ID # 6432.) This Court has jurisdiction to hear this appeal under 28 U.S.C. § 1291, which provides jurisdiction for appeals from a district court's final decision, and 28 U.S.C. § 2253, which provides jurisdiction for appeals in habeas cases.

## STATEMENT OF ISSUE PRESENTED

The use of false testimony is a due process violation only if the false testimony affected the trial's outcome. Here, although a jailhouse informant lied about the benefit he received for testifying about Foster's confession, his testimony was entirely independent of the remaining evidence in the case, including the compelling eyewitness testimony. Could fairminded jurists agree with the Michigan Court of Appeals' determination that the false testimony did not affect the guilty verdict?

## INTRODUCTION

In 1998, Deborah Boothby was brutally killed outside a bar in southwestern Michigan. She was beaten, kidnapped, run over, and left for dead in the road. It took over a decade before her murderers, including Ed Foster, were brought to trial. And after a critical eyewitness described Foster's role in the attack—including the knock-out punch he inflicted—a jury found him guilty for his actions on that heinous night.

Foster sought to overturn his conviction by blaming a lying, bank-robbing, fellow inmate, who testified that Foster made a jailhouse confession. He is not wrong about the lying part: Keith Nickerson falsely told the jury that he received no benefit for his testimony, yet it is undisputed that he received a 5-year reduction on his federal bank robbery sentence at least in part because of his testimony against Foster. But he *is* wrong to blame his conviction on Nickerson's testimony. That was largely due to the compelling eyewitness testimony, along with the testimony from three other witnesses to whom Foster either explicitly or implicitly confessed. And considering that the jury *did know*—through effective cross-examination by Foster's

counsel—the details of Nickerson's sentence benefit, it simply cannot be said that the false testimony affected the verdict.

That's all that it takes to decide this case. But 28 U.S.C. § 2254 places additional deferential limitations on review of Foster's claim. Because it is abundantly clear that fairminded jurists could agree with the Michigan Court of Appeals' decision to deny Foster's false-testimony claim, the district court's decision should be affirmed.

## STATEMENT OF THE CASE

On April 25, 1998, Deborah Boothby went to the Blue Star Lounge, a bar in Covert Township, Michigan. (9/27/10 Trial Tr., R. 9-12, Page ID # 2058; 9/28/10 Trial Tr., R. 9-13, Page ID # 2342.) There, she ran into her ex-boyfriend, Ivory Shaver, who was at the bar with another woman, Shevolier Gill. (9/28/10 Trial Tr., R. 9-13, Page ID # 2328–29; 9/30/10 Trial Tr., R. 9-15, Page ID # 2865, 2868.) Ivory's nephew, Scottie Shaver, was also there. (*See* 9/29/10 Trial Tr., R. 9-14, Page ID # 2495, 2498, 2545; 9/30/10 Trial Tr., R. 9-15, Page ID # 2635–36, 2720, 2815.) An intoxicated Boothby got into an argument with Ivory, hurling racial slurs in the process. (*See, e.g.*, 9/29/10 Trial Tr., R. 9-14, Page ID # 2481–91; 9/30/10 Trial Tr., R. 9-15, Page ID # 2868;

10/4/10 Trial Tr., R. 9-17, Page ID # 3227.) The confrontation caused such a disruption that the bar's owner decided to close early. (9/29/10 Trial Tr., R. 9-14, Page ID # 2430-33.) As the bar-goers left, a fight began in the parking lot, where witnesses saw several people beating Boothby. (*See, e.g.*, 9/29/10 Trial Tr., R. 9-14, Page ID # 2554–56, 2588; 9/30/10 Trial Tr., R. 9-15, Page ID # 2719–25.) Later that night, the police received a report that someone had been hit by a car. (9/27/10 Trial Tr., R. 9-12, Page ID #2058–59.) The police responded and found Boothby lying on the street near the Blue Star Lounge, severely injured. (*Id.* at 2059, 2061–62.) She died soon after arriving at a hospital. (*Id.* at 2072–73.)

The case went cold. But a task force with the Michigan State Police formed in 2007. (10/6/10 Trial Tr., R. 9-19, Page ID # 3787–88.) Numerous witnesses were interviewed over the next several years; some of them said that they had seen Foster participating in the attack on Boothby. (*See, e.g.*, 9/29/10 Trial Tr., R. 9-14, Page ID # 2552; 9/30/10 Trial Tr., R. 9-15, Page ID # 2720–33; 10/1/10 Trial Tr., R. 9-16, Page ID # 2971–72, 2977–78.)

One of those witnesses was Adrienne Burnett, who was dating Scottie Shaver at the time. (10/4/10 Trial Tr., R. 9-17, Page ID # 3239.) She saw the initial confrontation between Boothby and Ivory in the bar, and when the bar closed, she saw the fight in the parking lot, too. (10/4/10 Trial Tr., R. 9-17, Page ID # 3222–26.) But it wasn't just a fight—"[i]t appeared that they jumped her, it was horrible," Burnett said at trial. (*Id.* at 3232.) She identified Boothby's parking-lot assailants as Ivory, Gill, Scottie, and Foster, along with several others. (*Id.* at 3230.) Foster, in particular, "blasted her," which "put her out." (*Id.*) Burnett testified that she saw Scottie, Ivory, and Foster put Boothby into Gill's car. (*Id.* at 3234.) Ivory, Gill, and Foster got into that car, while Scottie got into Burnette's car with her. (*Id.* at 3236, 3239.) At Scottie's direction, Burnette followed Gill's car to an isolated area, where Gill choked Boothby and the three men began beating her again. (*Id.* at 3240–50.) At some point, Gill asked what they should do with Boothby, who was now no longer moving. (*Id.* at 3250.) Ivory suggested that they "dump[ ] her on the side of the road by the bar and mak[e] it look like somebody ran over her." (*Id.*) So Burnette and Scottie followed Gill's car back to the Blue Star Lounge. (*Id.* at 3252–

54.) There, Ivory and Foster pulled Boothby out of the car and onto the street and got back into Gill's car. (*Id.* at 3254.) Burnette told the jury that she then saw Gill's car "back[ ] up over [Boothby] and roll[ ] over her again." (*Id.* at 3254–55.) Burnette, again at Scottie's direction, also ran her over. (*Id.* at 3262–64.) For her role, Burnette pleaded guilty to second-degree murder. (*Id.* at 3211–13, 3399.)

Keith Nickerson also testified at Foster's trial. While awaiting sentencing in federal court for a bank-robbery conviction, Nickerson shared a cell with Foster. (10/6/10 Trial Tr., R. 9-19, Page ID # 3966–67.) According to Nickerson, Foster told him that he kicked Boothby in the head during the parking-lot beating and had been in one of the cars that ran over Boothby. (*Id.* at 3978–99.) On direct examination, Nickerson denied that the state prosecutor had offered him any benefits or done anything for him in exchange for his testimony. (*Id.* at 3965–66.) He also denied that he had mentioned anything to the federal judge at his sentencing about his assistance in Foster's prosecution, although he admitted that his attorney mentioned it. (*Id.* at 3981–82.) But, on cross-examination, Nickerson admitted that the federal prosecutor filed a "5K Motion" requesting that Nickerson be sentenced

below his guidelines. (*Id.* at 3984.) Nickerson acknowledged that he received a sentence that was five years below the guidelines minimum, but he testified that the reduction was not because of the "5K Motion." (*Id.* at 3984–85.) When asked if he heard the federal judge mention that the reason for the reduction was his "substantial assistance in a state murder case, along with some dispute about a definition of career criminal," Nickerson responded, "The departure was because of the close proximity of my previous offenses." (*Id.* at 3985.) Then, after acknowledging again that his attorney may have advocated for a reduction because of his cooperation in Foster's prosecution, Nickerson maintained that he "didn't receive a reduction from [his] assistance in this case." (*Id.* at 3987.) But he admitted that he could get a "Rule 35 departure" and receive a modified sentence in the future. (*Id.* at 3987–88.)

Three other prosecution witnesses are noteworthy. Two of them were Indiana law enforcement officers. Both of them testified that when they arrested Foster, he asked, "can a person be charged with murder if he was just with a person who committed the murder[?]" (*Id.* at 3845; *see also id.* at 3890.) After one of the troopers indicated that a

person could be charged as an accomplice to murder in that scenario, Foster asked if that would be true if a vehicle was involved. (*Id.* at 3846, 3890.) The other noteworthy witness was another jailhouse informant. Michael Smith was housed on the same block as Foster while he was in an Indiana jail. (*Id.* at 3915–16.) Smith testified that he was a paralegal and that Foster came to him for advice. (*Id.* at 3918.) Foster "bragged" to Smith that he and others beat Boothby and ran her over. (*Id.* at 3921–22.)

Finally, Foster testified in his defense. According to him, there was a violent rivalry between the residents of South Haven and Covert. (10/11/10 Trial Tr., R. 9-22, Page ID # 4405–06.) The Shavers were from South Haven; Foster was from Covert. (*Id.* at 4405, 4407–08.) Foster maintained that he and Scottie Shaver were "enemies" and that he would never have helped him with anything. (*Id.* at 4408–10.) Foster then admitted that he was at the Blue Star Lounge on the night of Boothby's murder, but he denied that he was involved. (*Id.* at 4410, 4424.)

A jury found Foster guilty.[1] (10/19/10 Trial Tr., R. 9-27, Page ID # 4985–86.) He was sentenced to life in prison without eligibility for parole. (11/17/10 Sentence Tr., R. 9-30, Page ID # 5089.) On appeal, he raised several claims, including that he was denied a fair trial because Nickerson provided false testimony. (2/2/12 Br. on Appeal, R. 9-31, Page ID # 5161–69.) The Michigan Court of Appeals allowed Foster to supplement the record to support his claim. (2/22/12 Mich. Ct. App. Order, R. 9-31, Page ID # 5336.) He provided a copy of the federal government's "Motion for Downward Departure" pursuant to "Sentencing Guideline §5K1.1," in which an Assistant United States Attorney indicated that Nickerson's testimony "proved to be instrumental in murder charges subsequently brought against five individuals" and that the state prosecutor had advised that Nickerson had "testified at a preliminary examination and was an important witness in the case." (4/7/10 Government's Motion for Downward Departure, R. 9-31, Page ID # 5261–62.) Based on that assistance, the

[1] Foster was tried jointly with Ivory, Gill, and Scottie, but Foster had a separate jury. The other jury hung; the three co-defendants were re-tried and ultimately convicted. *See People v. Shaver*, 2013 WL 4864204, at *2 (Mich. Ct. App. Sep. 12, 2013).

federal prosecutor "request[ed] that the Court grant a downward departure." (*Id.* at 5262.) Foster also provided to the state appellate court the transcript of his federal sentencing hearing. During that hearing, the federal sentencing judge noted the government's departure request for "substantial assistance to the state attorney general's office" and indicated that it was granting that request. (4/19/20 Sentencing Hr'g Tr., R. 9-31, Page ID # 5247–48.) In doing so, the court noted both Nickerson's cooperation with state authorities and "the fact that at the margin his career offender guideline does over score him." (*Id.*; *see also id.* at 5243.)

The Michigan Court of Appeals rejected that claim. That court acknowledged that "[i]t is well settled that a conviction obtained through the knowing use of perjured testimony offends a defendant's due process protections guaranteed under the Fourteenth Amendment." *People v. Foster*, No. 301361, 2013 WL 4033639, at *10 (Mich. Ct. App. Aug. 8, 2013). And it found that Nickerson's testimony was "contrary to the actual facts." *Id.* at *12. Yet the court determined that Foster's conviction was not "obtained through perjured testimony." *Id.* It noted that defense counsel had extensively cross-examined Nickerson and

"elicited the pertinent information." *Id.* The court also noted that defense counsel established that Nickerson's understanding—*i.e.,* his "subjective belief"—that he did not receive a reduction for his assistance conflicted with what actually happened. *Id.* Put differently, defense counsel adequately impeached Foster and undermined his credibility on this issue. *Id.* All told, "the jury heard what [Foster] ultimately sought to have [it] hear—that Nickerson received a benefit for his cooperation and testimony and thus had a motive to testify as he did against [Foster]." *Id.*

After rejecting Foster's other claims, the Michigan Court of Appeals affirmed. *Id.* at *1, *14. Foster then filed an application for leave to appeal in the Michigan Supreme Court, which was denied. *People v. Foster*, 847 N.W.2d 243 (Mich. 2014) (unpublished table decision).

Foster next filed a habeas petition under 28 U.S.C. § 2254 in the district court raising numerous claims, including his false-testimony argument. (6/22/15 Pet., R. 1, Page ID # 5.) After the district court granted him a stay to exhaust additional claims in state court, Foster filed an amended petition (11/20/20 Pet, R. 21), which the court denied

(8/28/23 Op. and Order, R. 26, Page ID # 6396, 6428). With respect to his false-testimony claim, the court noted that "[t]he falsity of Nickerson's testimony is somewhat supported by documents from Nickerson's federal criminal case." (*Id.* at 6413.) But it agreed with the state court that "much of the false testimony was corrected by defense counsel." *Id.* at 6417. And it reasoned that "Nickerson's credibility ha[d] little impact on the other substantial testimony and evidence against Foster." *Id.* at 6418. Overall, the district court concluded, Nickerson's statements did not affect the jury verdict, and it therefore denied habeas relief.[2] (*Id.* at 6416, 6419.)

Nevertheless, the district court granted a COA on the claim, finding that "reasonable jurists could debate whether Nickerson's testimony regarding his credibility would have caused the jury to disbelieve his testimony about Foster's confession and lead to a

[2] The district court's analysis was slightly unclear. It initially stated that it was "assum[ing]" that Nickerson's statements were "material[ ]" and was instead reviewing the claim to determine whether the error was harmless. (8/28/23 Op. and Order, R. 26, Page ID # 6416–17.) But the court never cited any harmless-error standard, and it concluded by stating that it did "not find that the state court unreasonably applied federal law in concluding that Nickerson's false statements *were immaterial* or that any error was harmless." (*Id.* at 6419 (emphasis added).)

different outcome." (8/28/23 Op. and Order granting COA, R. 27, Page ID # 6430.) But it denied a COA for his remaining claims. (*Id.*) As did this Court. (3/11/24 Order, Doc. 12-1, Page 1, 6.)

## STANDARD OF REVIEW

This Court reviews the district court's legal conclusions de novo and its factual findings for clear error. *Fleming v. Metrish*, 556 F.3d 520, 524 (6th Cir. 2009).

## SUMMARY OF ARGUMENT

To prove that the prosecutor presented known false testimony from Keith Nickerson to secure his conviction, Foster must prove that the testimony was material and that the Michigan Court of Appeals unreasonably determined that the testimony was not material. He cannot meet this burden for three reasons.

First, Nickerson's testimony was not a significant part of the prosecutor's case against Foster. Several eyewitnesses testified that they saw Foster participate in the murder. One of them, Burnett, described the whole thing in detail. Another jailhouse informant testified that Foster confessed to him. And two police officers described

how Foster implicitly admitted his role in the attack by asking hypothetical questions upon his arrest. Nickerson's testimony that Foster also confessed to him paled in comparison to the other strong evidence against him.

Second, Nickerson did not have any connection to those other witnesses. He was not an eyewitness to the crime. And he did not know the other jailhouse informant. Simply put, whether he lied and had a motivation to testify against Foster had no bearing on the credibility of the other prosecution witnesses.

Third, Nickerson's false statements—that he did not receive a benefit for his testimony—was presented to the jury. Foster's counsel effectively cross-examined Nickerson and cast significant doubt on the veracity of his statements. Counsel established that Nickerson's cooperation in Foster's case played a large role at his federal sentencing hearing. And Nickerson admitted that the federal prosecutor even filed a motion to reduce his sentence because of his cooperation.

Because the value of Nickerson's testimony paled in comparison to the compelling eyewitness evidence, because his credibility was entirely unconnected to the credibility of the other prosecution witnesses, and

because the jury was well-aware that he falsely testified that he did not receive a benefit for his testimony, rational jurists could conclude that Nickerson's testimony did not affect the outcome of Foster's trial. Therefore, the state court's decision was not an unreasonable application of clearly established federal law, and the district court correctly denied habeas relief. This Court should affirm.

## ARGUMENT

### I. The Michigan Court of Appeals reasonably determined that Nickerson's false testimony did not affect the outcome of Foster's trial.

The district court correctly rejected Foster's false-testimony claim. The record makes clear that Nickerson's false testimony was not material—it simply was not connected to, and had no effect on, the eyewitness and other testimony that conclusively established his role in the murder.

When evaluating a claim raised in a § 2254 petition, the analysis must begin with the statute, which significantly confines a federal court's authority to grant relief. If a state court rejects a claim on the merits, as the Michigan Court of Appeals did here, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) precludes relief

unless the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d).

A decision is an "unreasonable application" of clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Hill v. Curtin*, 792 F.3d 670, 676 (6th Cir. 2015) (en banc) (cleaned up). "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). (internal quotation marks and citation omitted). Circuit precedent cannot "refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 63 (2013) (per curiam) (citation omitted). As the Supreme Court has repeatedly pointed out, "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.' " *Kernan v. Cuero*, 583 U.S. 1, 8 (2017) (per curiam) (quoting *Glebe v. Frost*, 574 U.S. 21, 23 (2014)) (per

curiam). Neither do "state-court decisions, treatises, or law review articles." *Cuero*, 583 U.S. at 8.

At bottom, AEDPA imposes "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quotations and citations omitted). To obtain relief, "the state court's decision must have been more than incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). It must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

With those rigorous statutory limits in mind, turn to the Supreme Court precedent applicable here. "[D]eliberate deception of a court and jurors by the presentation of known false evidence," the Court has said, "is incompatible with rudimentary demands of justice." *Giglio v. United States*, 405 U.S. 150, 153 (1972) (internal quotes omitted). It is also unconstitutional for a prosecutor to allow false testimony to go uncorrected. *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (internal citations omitted). But only when the false testimony is " 'material' " is

a new trial warranted. *Giglio*, 405 U.S. at 153–54 (quoting *Brady v. Maryland*, 373 U.S., 83, 87 (1963)). And false testimony is material if it is " 'determinative of guilt or innocence.' " *Id.* (quoting *Napue*, 360 U.S. at 269). All told, "[a] new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .' " *Id.* (quoting *Napue*, 360 U.S. at 271). This Court has said that a false-testimony claim requires that a defendant show three things: " '(1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false.' " *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998) (quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989)).

There is no dispute that Nickerson has met the first requirement. It is possible that Nickerson merely misunderstood what occurred at his sentencing hearing, given the lengthy discussion of a complicated legal issue involving his career-offender status. But Nickerson maintained his belief that his sentence reduction was *not* a product of his cooperation in Foster's case, when his federal-case records unequivocally indicate that it *was*.

The third requirement is closer. When questioning Nickerson, the state prosecutor asked only whether he—the state prosecutor—had done anything to help Nickerson with his federal case. (10/6/10 Trial Tr., R. 9-19, Page ID # 3965–66.) Although the federal prosecutor's 5K motion indicated that he had spoken with the state prosecutor, there is no indication that the federal prosecutor informed the state prosecutor that he was going to ask for a reduction based on Nickerson's assistance in Foster's case. (*See* 4/7/10 Government's Motion for Downward Departure, R. 9-31, Page ID # 5261–62.) In other words, the state prosecutor might not have *known* about the motion and the federal court's reasons for imposing a reduced sentence. Perhaps he *should have* known, but it is not clear that Foster has met this requirement.

In any event, the only prong that truly matters for purposes of this appeal is whether Nickerson's testimony was material. False evidence that affects the credibility of a witness could be material. *Giglio*, 405 U.S. at 154 (citing *Napue*, 360 U.S. at 269). The facts in *Giglio* illustrate when such a case occurs. The defendant in *Giglio* was charged with passing forged money orders. *Id.* at 150. His coconspirator, a teller at a bank who had cashed the forged money

orders, testified against him. *Id.* at 151. He told the jury that he received no promises that he would not be prosecuted for his role. *Id.* at 151–52. After the trial, however, the defendant discovered that a prosecutor *had* promised that the testifying coconspirator would not be prosecuted if he testified. *Id.* at 152. The Supreme Court noted how critical the coconspirator's testimony was: "the Government's case depended almost entirely on [the coconspirator]'s testimony; without it there could have been no indictment and no evidence to carry the case to the jury." *Id.* at 154. In these circumstances, the Court held, "evidence of any understanding or agreement as to a future prosecution would be relevant to [the coconspirator's] credibility and the jury was entitled to know of it." *Id.* at 155.

Contrast the facts of *Giglio* with those present here. Nickerson's testimony was far from the only evidence proving Foster's guilt. Adrienne Burnett saw the brutal murder. (10/4/10 Trial Tr., R. 9-17, Page ID # 3222–64.) She described the entire ordeal at length, detailing the roles of Foster and his co-defendants. (*Id.*) She told the jury that Foster "blasted" Boothby and "put her out." (*Id.* at 3230.) Then she outlined how Foster helped put Boothby in a car, drove to an isolated

area, continued to beat the helpless woman, put her back in the car, drove her back to the bar, took her out of the car and put her onto the road, got back in the car, and ran her over, twice. (*Id.* at 3234–55.) Additional eyewitnesses confirmed Foster's participation. (*See, e.g.*, 9/29/10 Trial Tr., R. 9-14, Page ID # 2552; 9/30/10 Trial Tr., R. 9-15, Page ID # 2720–33; 10/1/10 Trial Tr., R. 9-16, Page ID # 2971–72, 2977–78.)

On top of the compelling eyewitness testimony, two police officers testified that Foster implicated himself when he was arrested. (10/6/10 Trial Tr., R. 9-19, Page ID # 3845–46, 3890.) And a jailhouse informant, Michael Smith, described how Foster confessed to him. (*Id.* at 3921–22.) And while Smith's testimony may closely resemble Nickerson's, the two did not know each other. (And were not even incarcerated in the same state.) (10/6/10 Trial Tr., R. 9-19, Page ID # 3982.)

True, this is not a sufficiency case; this Court must look at *the effect* of the false testimony, not merely the remaining evidence. But the remaining evidence is still a significant factor, and Nickerson's testimony was entirely independent of that other evidence. Whether Nickerson received a benefit for his testimony could impact his own

credibility, but it does not impact the credibility of any other witness. That Nickerson received a reduction to his federal prison sentence benefits nobody except himself; it might give *him* a motive to lie—but nobody else. That is especially true considering that Nickerson was not an eyewitness to the actual crime and had no connection to any of the eyewitnesses who implicated Foster as an active participant in the brutal murder.

And even had Nickerson been entirely forthcoming about his deal, it is hard to see how that had any effect on the quality of the other evidence. The jury could easily have determined that Nickerson entirely fabricated Foster's confession and yet still found that Foster was guilty beyond a reasonable doubt. Juries may make such witness-by-witness credibility determinations. *See United States v. Warren*, 37 F. App'x 88, 2002 WL 971531, at *1 (5th Cir. 2002) ("The jury was free to believe one witness's testimony over another's. . . ."). The trial court even instructed the jury that it could partition its credibility findings out further and address each witness's testimony piece by piece. (10/14/10 Trial Tr., R. 9-24, Page ID # 4824 ("You must decide which witnesses you believe and how important you think their testimony is.

You do not have to accept or reject everything a witness said. You are free to believe all, none, or part of any person's testimony.").) It would have been entirely consistent to find that Nickerson's rendition of Foster's confession was not credible and, simultaneously, find that Burnett (and the other eyewitnesses) truthfully described Foster's participation in the attack. In other words, whether Nickerson received a benefit for his testimony was not important to the outcome of the case.

Not only was Nickerson's testimony a drop in the pond of the evidence against Foster, but—unlike the coconspirator's testimony in *Giglio*—it was also significantly impeached at trial, thus limiting any effect it may have had. During cross-examination, Nickerson admitted several facts that, taken together, any reasonable juror would understand as meaning that he received a benefit for his testimony. He admitted that his attorney told the federal judge during his sentencing hearing that he should be given a lesser sentence because of his cooperation with Foster's prosecution. (10/6/10 Trial Tr., R. 9-19, Page ID # 3986.) He acknowledged that the federal government also asked that Foster's sentence be reduced. (*Id.* at 3984.) And he admitted that he did, in fact, receive a sentence that was five years less than the

minimum that his guidelines range provided. (*Id.*) Although he continued to deny that the reduction was because of his cooperation, his admissions that the attorneys for both parties in his case agreed that he should receive a sentence reduction for his testimony is not logically consistent with his refusal to admit that his substantial reduction was not a benefit for his testimony. Any rational juror would have been aware of this inconsistency, making it less likely that Nickerson's cooperation testimony affected the verdict.

After all this, if this Court still thinks there is a reasonable likelihood that Nickerson's false testimony affected the verdict, the district court was still correct to deny relief. Remember, this is a § 2254 habeas petition, which means that the Michigan Court of Appeals' decision must "be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). Considering the substantial evidence against Foster independent of Nickerson's testimony, along with the cross-examination that mitigated the effect of the false statements Nickerson provided, fairminded jurists could conclude that *Giglio*'s materiality requirement was lacking in this case. *See Smith v. Davis*, No. 23-3604, slip op. at 34 (6th Cir. Jul. 31, 2024) (Thapar, J., dissenting) ("The point

of AEDPA is to leave all but the most indisputably obvious legal questions to the judgment of state courts, subject to direct appeal, and out of the hands of federal courts on collateral review.”).

And more, even if a constitutional error did occur here, Foster cannot meet the difficult harmless-error test on collateral review. That test precludes relief unless he can show that the error “had substantial and injurious effect or influence in determining the jury’s verdict.” *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993); *see also Brown v. Davenport*, 596 U.S. 118, 126, 133 (2022) (noting that the *Brecht* harmlessness analysis “effectively invert[s]” the burden from *Chapman v. California*, 386 U.S. 18 (1967), and that it was designed to protect the habeas principle that state-court judgments should not be undone unless there was an “extreme malfunction”) (cleaned up). The case against Foster hinged on eyewitness testimony. A finding that Nickerson’s false testimony about his sentencing benefit had an effect on the verdict is incompatible with the facts of this case; a finding that the effect was also *substantial and injurious* would be entirely irrational.

This Court should affirm.

## CONCLUSION AND RELIEF REQUESTED

This Court should affirm the district court's decision denying habeas relief.

Respectfully submitted,

Dana Nessel
Michigan Attorney General

Ann M. Sherman (P67762)
Solicitor General

/s/ Jared D. Schultz
Assistant Attorney General
Co-Counsel of Record
Attorneys for Respondent-Appellee
Criminal Appellate and Parole Appeals Division
P.O. Box 30217
Lansing, MI 48909
517-335-7650
SchultzJ15@michigan.gov

Dated: August 5, 2024

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the part of the document exempted by Federal Rule of Appellate Procedure 32(f), this brief contains no more than 13,000 words. This document contains 4,909 words.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Word 2013 in 14-point Century Schoolbook.

/s/ Jared D. Schultz
Assistant Attorney General
Co-Counsel of Record
Attorneys for Respondent-Appellee
Criminal Appellate and Parole Appeals Division
P.O. Box 30217
Lansing, MI 48909
517-335-7650
SchultzJ15@michigan.gov

## CERTIFICATE OF SERVICE

I certify that on August 5, 2024, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record (designated below).

ED FOSTER, 226862
EARNEST C. BROOKS CORRECTIONAL FACILITY
2500 S. SHERIDAN DRIVE
MUSKEGON HEIGHTS, MI 49444

/s/ Jared D. Schultz
Assistant Attorney General
Co-Counsel of Record
Attorneys for Respondent-Appellee
Criminal Appellate and Parole Appeals Division
P.O. Box 30217
Lansing, MI 48909
517-335-7650
SchultzJ15@michigan.gov

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Respondent-Appellee, per Sixth Circuit Rule 28(a), 28(a)(1)-(2), 30(b), hereby designated the following portions of the record on appeal:

| Description of Entry | Date | Record Entry No. | Page ID No. Range |
|---|---|---|---|
| Petition for Writ of Habeas Corpus | 06/22/2015 | R. 1 | 5 |
| Trial Transcript | 09/27/2010 | R. 9-12 | 2058-59, 2061–62, 2072–73 |
| Trial Transcript | 09/28/2010 | R. 9-13 | 2328–29, 2342 |
| Trial Transcript | 09/29/2010 | R. 9-14 | 2430-33, 2495, 2498, 2552, 2545, 2481–91, 2554–56, 2588 |
| Trial Transcript | 09/30/2010 | R. 9-15 | 2719–33, 2865, 2868, 2635–36, 2720, 2815 |
| Trial Transcript | 10/01/2010 | R. 9-16 | 2971–72, 2977–78 |
| Trial Transcript | 10/04/2010 | R. 9-17 | 3211-13, 3232, 3230, 3234, 3236, 3222–64, 3239-3250, 3252-55, 3262-64, 3399 |
| Trial Transcript | 10/06/2010 | R. 9-19 | 3845-46, 3890, 3921-22, 3978-99, 3965-67 |
| Trial Transcript | 10/11/2010 | R. 9-22 | 4405-4410, 4424 |

| | | | |
|---|---|---|---|
| Trial Transcript | 10/14/2010 | R. 9-24 | 4824 |
| Trial Transcript | 10/19/2010 | R. 9-27 | 4985-86 |
| Sentence Transcript | 11/17/2010 | R. 9-30 | 5089 |
| Michigan Court of Appeals 301361 | 02/02/2012 | R. 9-31 | 5161-69, 5243, 5247-48, 5261-62, |
| Amended Memorandum of Law in Support of Petition for Writ of Habeas Corpus | 11/20/2020 | R. 21 | 5848-5913 |
| Opinion and Order Denying Motion to Hold in Abeyance | 08/28/2023 | R. 26 | 6936, 6413, 6416-19, 6428 |
| Opinion and Order Granting Certificate of Appealability | 08/28/2023 | R. 27 | 6430 |
| Notice of Appeal | 09/14/2023 | R. 29 | 6432 |